IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

RONALD TRYON                                                        PLAINTIFF

v.                              Civil No. 05-2169

DEPUTY DYKE; LT. JACKSON;
and NURSE CHRIS REED                                               DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Ronald Tryon, filed this civil rights action pursuant to 42 U.S.C. § 1983 on December 6, 2005. Tryon proceeds in forma pauperis and pro se.

Tryon contends his constitutional rights were violated in a number of ways by the defendants. The defendants' motion for summary judgment is pending before the undersigned (Doc. 19). Plaintiff filed a response to the motion (Doc. 23) and a supplemental response to the motion (Doc. 25). The supplemental response was filed after the court propounded a questionnaire to obtain additional information from the plaintiff (Doc. 24).

## BACKGROUND

Tryon was booked into the Sebastian County Detention Center on March 16, 2004. *Response* (Doc. 25) (hereinafter *Resp.*) at ¶ 1. He was on a parole hold and being held on pending criminal charges. *Resp.* at ¶ 2.

On March 22, 2004, Tryon escaped from the Greenwood Courthouse. *Defendants' Exhibit* 1 at page 1 (hereinafter *Defts' Ex.*). He slipped out of his cuff and escaped from the southernmost exit. *Id.* at page 2. Inmate Daniel Haworth had been handcuffed to Tryon and reported to Corporal Lensing that Tryon had slipped off the cuff once and put it back on because there were

-1-

too many people.  *Id.* at pages 2 and 3.  Tryon then took it off again and escaped while Lensing and the bailiff were occupied.  *Id.*

Tryon was booked back into the SCDC on May 14, 2004.  *Resp.* at ¶ 6.  On June 18, 2004, Nurse Crystal Reed made a note to the file that Brother Bob had advised her that Tryon had told several preachers and churches that he was dying.  *Defts' Ex.* 1 at page 4.  Reed noted a church was praying over Tryon because the church members had been informed that Tryon had a life threatening illness.  *Id.*  Reed indicated she was going to freeze Tryon's funds and he was advised to fill out a medical request.  *Id.*

Tryon states he never had "any type of prayer."  *Resp.* at ¶ 7(A).  Tryon's medical records at the SCDC contained no indication he had a life threatening illness and he had not complained of any serious illness while at the SCDC.  *Id.* at ¶ 7(B).  Tryon did not have a life threatening illness.  *Id.* at ¶ 7(D).  Tryon maintains his funds were not frozen and were instead taken off his books.  *Id.* at ¶ 7(C).

On August 15, 2004, Deputy Kim Taulbee reported that Tryon became uncooperative while waiting to be transported back to the Arkansas Department of Correction (ADC).  *Defts' Ex.* 1 at page 5.  Taulbee reported that Tryon was insisting he was going to take all of his commissary items with him on the transport.  *Id.*  Tryon was advised he could only take his Bible and legal work.  *Id.*

Tryon got up off the bench and approached Taulbee who ordered him to sit back down.  *Defts' Ex.* 1 at page 5.  Corporal Gadke told Tryon to leave his property and go to the intake shower to be dressed in his ADC whites.  *Resp.* at ¶ 8(D).  After Tryon was dressed in his whites,

-2-

he asked Corporal Dyke if he could take his commissary. *Id.* at ¶ 8(E). Dyke stated he could not. *Id.*

According to defendants, Tryon was getting loud, asking for a grievance form, and started yelling and swearing. *Defts' Ex.* 1 at pages 5 and 6. Although Tryon was initially told he did not need a grievance form since he was leaving and would not get a response to it, Taulbee then told DFC Lee to get Tryon a grievance form and a property form. *Defts' Ex.* 1 at page 5. Tryon asserts he was never given the grievance form he asked for. *Resp.* at ¶ 8(L).

Tryon was given a bag to take his ADC undershorts with him. *Defts' Ex.* 1 at page 6. Gadke and White took Tryon to C-5 visitation. *Id.* Tryon told Taulbee he would get Taulbee when he got out. *Id.* Tryon denies having made this statement. *Id.*

When Dyke was ready for Tryon, he was given his transport sack and he threw it against the wall. *Resp.* at ¶ 8(I). Tryon insisted on completing an inventory. *Id.* According to defendants' records, Dyke asked Tryon if he needed to use the restroom and Tryon refused. *Defts' Ex.* 1 at page 6. Tryon, however, states that at no time did Dyke let him use the restroom. *Resp.* at ¶ 8(J).

According to defendants' records, when Dyke began to place restraints on Tryon, he commented about the five hour drive and stated he was going to "shit on himself on the way there." *Defts' Ex.* 1 at page 6. Tryon was asked whether he made this comment and he responded that he was without knowledge to agree or disagree. *Resp.* at ¶ 8(K). A video tape was made of Tryon's departure due to his disruptive behavior and it was recommended that he be placed on administrative segregation while housed at the SCDC in the future. *Defts' Ex.* 1 at pages 6-7.

Tryon indicated it was going to be a long trip. *Defts' Ex.* 1 at page 10. He told the other inmates to stay clear. *Id.* He was placed in chains for the transport. *Id.*

Tryon told Gadke and Taulbee that he would make them pay. *Resp.* at ¶ 12.  However, Tryon indicates he was referring to making them pay for his property.  *Id.*  Tryon asserts they responded that the courts would only give him one dollar.  *Id.*  According to Tryon, this was not the trip during which he was forced to use the restroom in his pants during transport because Dyke would not allow Tryon to leave the van and use a restroom.  *Resp.* at ¶ 8(N).

On another unspecified occasion during transport, Tryon alleges Dyke refused to allow Tryon to use the restroom for five to seven hours. *Initial Response* (Doc. 23) at ¶ 1.  Tryon alleges Dyke deliberately disregarded Tryon's need to use the restroom telling him to hold it or "go in his pants." *Id.* & *Complaint* at page 4.  According to Tryon,  "[t]he complaint states Tryon used the bathroom in his pants.  This alone is injury enough to implicate the 8th Amendment." *Id.*

On November 5, 2004, Dyke was transporting prisoners and stopped at Lee County Jail. *Resp.* at ¶ 101.  He had the inmates exit the van.  *Id.*  However, Tryon did not exit and remained seated in the rear of the van.  *Id.*

Dyke went around the rear of the van to retrieve property.  *Resp.* at ¶ 102.  When he stepped back to the side of the van, Dyke indicates Tryon was sitting on the floor.  *Id.*  Dyke asked what had happened and Tryon stated he had fallen.  *Id.*

According to Dyke's incident report,[1] he helped Tryon to his feet and asked if he was okay. *Defts' Ex.* 1 at page 112.  Dyke indicates Tryon responded that he had bumped his elbow but were fine.  *Id.*

Dyke then indicates he took Tryon to the intake area for Brickeys. *Defts' Ex.* 1 at page 112.  Dyke states he waited with Tryon and Arkansas Department of Correction (ADC) Officer

---

[1]The date of the occurrence is November 5, 2004.  However, the date the incident report was written was December 26, 2005.  *See Defts' Ex.* 1 at page 112.

-4-

Burton for about thirty minutes for a receipt for Tryon. *Id.* During this time, Dyke states Tryon did not complain about any injury. *Id.*

According to Tryon, he was not helped up by Dyke. *Resp.* at ¶ 103. Instead, Tryon states an officer from Lee County, who had seen what occurred on video, helped Tryon. *Id.* Tryon also maintains he asked for a doctor. *Id.* Once he got to the ADC, Tryon indicates he asked for help. *Id.* at ¶ 104. Tryon states Lt. Steel helped him. *Id.*

That same day, Tryon was seen by a nurse at the ADC. *Resp.* at ¶ 105. He complained of having hurt his right elbow. *Id.* Note was made that there was some swelling and a small hematoma. *Id.* at ¶ 106. He was prescribed Tylenol. *Id.* He did not receive any other medical treatment. *Id.* at ¶ 107.

It is not clear from the record when Tryon returned to the SCDC, however, on November 15, 2004, he was seen by Nurse Reed complaining of a broken finger. *Resp.* at ¶ 13 & ¶ 14. He told Nurse Reed he had gotten kicked in the finger the day before and that he believed it was broken. *Id.* at 15.

Nurse Reed examined it and observed the fingertip and knuckle of Tryon's right pinky finger was slightly swollen and bruised. *Resp.* at ¶ 16. She offered to buddy tape the finger to the ring finger. *Id.* He refused. *Id.*

He asked about x-rays and Nurse Reed told him the emergency room would buddy tape the fingers and let them heal. *Resp.* at ¶ 17. Tryon also told Nurse Reed that he had fallen out of the van the week before and hit his elbow. *Id.* at ¶ 18. He told her he thought it was chipped. *Id.*

AO72A
(Rev. 8/82)

Nurse Reed noted Tryon had a small bump on the right elbow that could be moved around. *Defts' Ex.* 1 at page 13. She noted it felt like a soft pea size mass. *Id.* She noted Tryon did not complain of any pain in his elbow and did not ask for pain medication. *Id.*

Tryon states he asked for x-rays and told Nurse Reed the accident had happened on his last transport the week before. *Resp.* at ¶ 19(A). Tryon maintains he informed Nurse Reed that Dyke did not report the accident or take him to see a doctor. *Id.* Tryon indicates he submitted additional requests for medical treatment for the injury to his elbow. *Id.* at ¶ 19(B). Tryon asserts there is a chipped bone in his elbow and he has not recovered from the injury. *Id.* at ¶ 19(C).

On February 2, 2005, Judge Fitzhugh, Circuit Court Judge of Sebastian County, ordered Tryon to be released from the ADC to Sebastian County for court proceedings. *Resp.* at ¶ 20. On February 4, 2005, an order of conditional release was issued paroling Tryon and instructing him to report to his parole officer within twenty-four hours. *Id.* at ¶ 21. Tryon was paroled to the SCDC where he was held on charges of methamphetamine possession, drug paraphernalia possession, theft by receiving, breaking or entering, and second degree escape. *Resp.* at ¶ 22.

On April 22, 2005, Tryon was scheduled for an appointment with Dr. Chambers. *Resp.* at ¶ 23. On April 26, 2005, Tryon submitted a grievance. *Resp.* at ¶ 24. He complained because $25 had been deducted from his account on April 21st for transportation to Dr. Chambers. *Id.* He stated he had not been taken anywhere and all his doctor trips were court ordered and he had not requested any doctor visits. *Id.*

Sgt. Brown responded on April 28, 2005, that arrangements had been made for Tryon to go for his appointment and he was responsible for the cost of transportation if the visits were court ordered or not. *Resp.* at ¶ 25. However, Tryon was given back the money for this trip because the appointment was canceled and he was not transported. *Id.* at ¶¶ 25, 26, 27.

-6-

On May 6, 2005, Tryon complained that the donuts he had gotten were six months past the sell-by date and tasted bad. *Resp.* at ¶ 28. He asked that the donuts be replaced with Danish. *Id.* The donuts were replaced. *Id.*

On May 18, 2005, an appointment with Western Arkansas Counseling and Guidance Center was made for Tryon by his family. *Resp.* at ¶ 29. Notice of the appointment was received by the jail by fax. *Id.* The appointment was scheduled for May 20th at 1:30. *Id.* Tryon was taken to the appointment. *Id.* at ¶ 30.

On June 2, 2005, Tryon stated he had not had commissary since May 12, 2005. *Resp.* at ¶ 31. He requested indigent envelops. *Id.* Sgt. Ritter responded that he would look into it and that indigents were passed out on Wednesdays. *Id.* at ¶ 32.

On July 10, 2005, Tryon submitted a grievance complaining that his hour out was being used for both eating time and showering time. *Resp.* at ¶ 33. He stated that was not enough time. *Id.* Sgt. Brown responded that he had been given time according to federal regulations. *Id.* at ¶ 34.

On August 15, 2005, Tryon submitted a request for library time. *Resp.* at ¶ 35. He also asked to see a copy of the state and federal constitutions. *Id.* Sgt. Ritter instructed Tryon to contact the courts. *Id.* at ¶ 36. Lt. Jackson also told Tryon that he could contact any court by mail and that the jail did not have a law library. *Id.*

On August 15, 2005, Tryon submitted a grievance stating that during a cell search on August 11th his legal work was gone through without him being present. *Resp.* at ¶ 37. He stated that a copy of a motion was lost. *Id.* He asked that another copy of the motion be provided by the courts or the public defender's office. *Id.*

-7-

In response, Ritter told Tryon to contact the courts. *Resp.* at 38. Jackson told Tryon that his paperwork was picked up during the cell search and moved aside while contraband was being looked for but that no deputy was looking at, or reading, legal paperwork. *Id.* He was told to write to the courts for copies that were missing. *Id.*

On August 29, 2005, Tryon complained that because inmate Shepherd had dropped his razor in a toilet everyone was being punished. *Resp.* at ¶ 39. Ritter responded that Shepherd would remain on lockdown and everyone else would be let out. *Id.* at ¶ 40.

On September 6, 2005, Tryon submitted a grievance stating that his calling card told him that he was calling the wrong destination number. *Resp.* at ¶ 41. However, he stated if he called collect it would go through. *Id.* Jackson responded that Tryon had not purchased a card since August 4, 2005. *Id.* at ¶ 42. Tryon, however, asserts that the calling card was purchased for him. *Id.*

On September 8, 2005, Tryon complained his elbow was shattered due to falling out of the van during transport in October of 2004. *Resp.* at ¶ 43. He indicated Dyke was the transport officer. *Id.* Tryon stated Dyke never took Tryon for help. *Id.* Tryon stated he wanted expenses and his elbow fixed. *Id.*

Officer Hicks responded that Tryon had not complained about this issue previously and there was no record of the injury. *Resp.* at ¶ 44. Lt. Jackson responded that the nurse did not have the injury documented and if Tryon needed an appointment he should fill out a medical form. *Id.* at ¶ 45.

Tryon, however, states that Nurse Reed's notes from his visit to her on November 15, 2004, establish he reported the injury to his elbow to her. *Resp.* at ¶ 44 & ¶ 18 (Reported having

-8-

fallen out of the van the week before and hit his elbow.  Thought the elbow was chipped).  The November 15, 2004, report to Nurse Reed was the only report of the injury Tryon made until the report on September 8, 2005.  *Id.* at ¶ 46.

On September 20, 2005, Tryon submitted a grievance complaining that he had $18.67 in his account on September 15th.  *Resp.* at ¶ 47.  He stated when he placed a commissary order on Monday he didn't get anything because somehow his money had been taken.  *Id.*

In response, Tryon was told that his account had been frozen by the nurse until his medical problems were cleared up.  *Defts' Ex.* 1 at page 66.  However, Tryon maintains his account was not merely frozen but the money taken from it.  *Resp.* at ¶ 48 & ¶ 53.

On September 21, 2005, Tryon submitted a grievance stating that the nurse could not freeze his account because he had not seen the nurse.  *Resp.* at ¶ 49(A).  He also stated that it was extortion since he was told the account would only be unfrozen if he wrote and said there was nothing wrong with his elbow.  *Id.*

Specifically, Tryon was told:  "Your account has been frozen for pending medical charges.  If you write a statement saying you need no medical attention then your money will be released."  *Defts' Ex.* 1 at page 67.  Jackson also wrote that the nurse did deduct money from inmate accounts for medical charges.  *Id.* at page 68.  Jackson also advised Tryon that the nurse's notes were not available to inmates.  *Id.*

Tryon also stated he had been told on September 9th that there was a record of the injury to his elbow and on September 19th that Jackson said there was a document on medical.  *Resp.* at ¶ 49(B).  Tryon does not know what document Jackson was referring to.  *Id.*

On September 28, 2005, Tryon submitted a grievance complaining he was charged for transportation to Western Arkansas Counseling. *Resp.* at ¶ 54. He stated that the court had ordered him to be transported and he asked for his $25 back. *Id.* He stated the county had failed to keep the first appointment. *Id.* In response, Ritter stated the appointment had been set up by Tryon's family and he would be charged the $25. *Id.* at ¶ 55. Tryon agrees that his family set up the appointment but states it was court ordered. *Id.*

Jackson responded that it was Tryon's motion asking for transportation for an evaluation. *Resp.* at ¶ 56. She stated the court only ordered the SCDC to transport Tryon there. She indicated his first appointment had been canceled by the doctor. *Id.* Tryon agrees the first appointment was canceled but states it was canceled only after the SCDC failed to transport him to the first visit. *Id.*

On September 28, 2005, Tryon wrote a letter to Captain Conger. *Resp.* at ¶ 57. Tryon indicated he had submitted a grievance on September 15, 2005, about his elbow being hurt and that Dyke failing to report the injury. *Id.* He indicated he was hurt when Dyke would not put the step down on the van and he was required to get out in leg and belly chains. *Id.* He indicated he fell and hurt his elbow. *Id.* He stated he was first told there was no record of the injury and was then told that there was a record. *Id.* He stated his account had been frozen by the nurse and he was told it would remain frozen unless he wrote a statement indicating he did not need medical attention. *Id.*

Ritter responded that he had checked into the elbow situation and had found no records that Tryon had reported his elbow being injured. *Defts' Ex.* 1 at page 75. If his elbow was bothering him, he was told to fill out a medical request form. *Id.* He was also told his account

-10-

had been released. *Id.* If there were any further medical issues, he was told his account could be frozen. *Id.*

On October 10, 2005, Tryon submitted a grievance stating that Attorney Kevin Hickey had been told he could not see Tryon that day. *Resp.* at ¶ 59(A). Hickey was not Tryon's court appointed attorney. *Id.* at ¶ 59(B). However, Tryon's wife wanted Hickey on Tryon's case. *Id.*

Tryon could send and receive mail from the courts. *Resp.* at ¶ 59(C). He had access to a phone. *Id.* at ¶ 59(D). He could file motions with the lower courts but states he did not have the address for the higher courts. *Id.* at ¶ 59(G). His attorney could visit him at the SCDC, call him there, or write to him. *Id.* at ¶ 59(H). He was able to pursue some of his legal options but asserts he missed the deadline for filing a writ to the Supreme Court because he didn't see his lawyer and didn't have access to a law library. *Id.* at ¶ 59(I) & P 59(J).

In response to Tryon's October 10th grievance, Ritter stated Hickey had come to see another inmate. *Resp.* at ¶ 60. Tryon, however, asserts Hickey came to see another inmate and Tryon. *Id.* Jackson responded that Hickey could visit Tryon anytime within reason. *Id.* at ¶ 61.

On October 11, 2005, Tryon submitted a grievance stating he had sent his grievance regarding the $25 charge for transportation to his doctor's appointment to the next step and not received a response. *Resp.* at ¶ 62. Jackson responded that the grievance had been answered on October 3rd and that Tryon would be given another copy. *Id.* Tryon states he never received another copy of the grievance. *Id.*

A docket sheet narrative inquiry shows that in Tryon's criminal case he submitted a motion for transportation to a psychiatric evaluation. *Defts' Ex.* 1 at page 80. Tryon asserts he asked to withdraw this request. *Resp.* at ¶ 63.

On October 13, 2005, while Deputy Devane was conducting a cell inspection he noticed Tryon acting suspiciously. *Resp.* at ¶ 64. Devane conducted a strip search of Tryon and found a lighter, fingernail clippers, $20 cash, and 4 Tylenol. *Id.* Tryon was moved to lockdown pending a formal hearing. *Id.* The cash was placed in his property. *Id.*

Tryon was charged with possession of contraband as a result of this incident. *Resp.* at ¶ 65(A). He was found guilty and locked down for thirty days. *Id.* at ¶ 65(B).

On October 22, 2005, Inmate Durham told Deputy Reilly that Tryon and Inmate Lai had beaten him up. *Defts' Ex.* 1 at page 82. According to defendants, Tryon admitted to helping Lai beat Durham but stated that Durham had threatened other inmates first. *Id.* Tryon denies helping beat Durham or admitting any involvement in this incident. *Resp.* at ¶ 66.

A disciplinary hearing was conducted and Tryon was given notice of the hearing. *Resp.* at ¶ 67. Tryon was charged with having a physical confrontation with injury to an inmate. *Id.* at ¶ 68. Witness Martin Rievera appeared at the hearing. *Id.* Tryon was found guilty and put on permanent lockdown. *Id.* at ¶ 69.

On October 23, 2005, Tryon submitted a grievance stating that he had been found guilty of a fight that was not his doing. *Resp.* at ¶ 70. He stated there was no evidence he was even involved. *Id.* He stated that Durham lied to Reilly. *Id.*

Jackson responded that at first Tryon admitted to the deputies that he helped beat Durham up. *Defts' Ex.* 1 at page 86. Then after Tryon got permanent lockdown as a punishment, Jackson stated Tryon started denying it. *Id.* Jackson stated she was sure Durham saw who beat him up. *Id.*

-12-

On November 1, 2005, Officer Creekmore reported that Deputy Marriott had called for assistance to BC Seg. *Defts' Ex.* 1 at page 90.  Upon entering, Creekmore saw Tryon with inmate Xayavong in front of him and he had his forearm against Xayavong's throat. *Id.*  Tryon was instructed to let Xayavong go and would not. *Id.*  Creekmore warned Tryon that he would spray Tryon with OC spray if he did not let go. *Id.*

According to Tryon, he was only holding Xayavong down to keep him from hitting Tryon. *Resp.* at ¶ 72.  Tryon maintains he was told he was doing the right thing by all the officers. *Id.*

Tryon did not let go of Xayavong so Creekmore administered a short burst of OC spray to Tryon's face hitting him in the left eye and eye area. *Resp.* at ¶ 74.  Tryon let Xayavong go and Tryon was taken to the hallway and then to the nurse's station for treatment of a small cut under his right eye. *Id.* at ¶ 75.  Tryon was then decontaminated and returned to his cell. *Id.* at ¶ 76. After the OC was administered, Tryon was given an OC warning sheet to initial and sign. *Id.* at ¶ 77.

On November 4, 2005, Tryon submitted a grievance stating that he was using his phone card when the phone got shut off with no warning. *Resp.* at ¶ 78.  He asked that his card be replaced. *Id.*

Jackson responded that all calls cost money. *Resp.* at ¶ 79.  She stated they could not always determine when the phones would be shut off. *Id.*  She stated Tryon could ask a deputy next time if the phones would be on long enough for him to make his call. *Id.*

On November 12, 2005, Tryon submitted a grievance about his calling card. *Resp.* at ¶ 80.  He stated that at 10:42 he had used the card and it said he had $9.90 left on it. *Id.*  At 10:47

-13-

it said he only had sixty seconds remaining and then it disconnected. *Id.* He stated there was something wrong with the phone. *Id.* He indicated the call should have cost $3.60 but the phone had deducted $9.90. *Id.*

Jackson responded that Tryon was charged for two calls on November 12th. *Defts' Ex. 1* at page 95. One call was $5.15 and the other $3.60. *Id.* She stated there was not enough left on the card to make another call. *Id.* She stated the SCDC had no control over what the phone company charged Tryon. *Id.*

On December 3, 2005, Tryon submitted a grievance asking why inmates on lockdown were feed on foam trays. *Resp.* at ¶ 82. He stated this kept him from getting the same portions as everyone else. *Id.* He also stated the food always got mixed up. *Id.*

Hicks responded that the portions on the foam trays were the same as those on the hard trays. *Resp.* at ¶ 83. He stated Tryon was feed in his cell because he was on twenty-three hour a day lockdown. *Id.*

On December 7, 2007, Tryon wrote Conger asking to be removed from lockdown. *Resp.* at ¶ 84. Ritter responded telling Tryon that he had been removed from lockdown by Conger. *Id.* at ¶ 85. Tryon was removed from lockdown. *Id.* at ¶ 86.

On December 8, 2005, Tryon submitted a grievance asking why he didn't get an answer to his grievance dated December 2nd about his calling card. *Resp.* at ¶ 87. He stated he made one call and it took all his calling card. *Id.*

Jackson responded that Tryon had made two calls to the same number on December 2nd and that used up his card. *Defts' Ex. 1* at ¶ 88. She also noted this was his first grievance about his card. *Id.*

-14-

On December 13, 2005, Tryon submitted a grievance requesting a copy of the inmate handbook. *Resp.* at ¶ 89.  Ritter responded that he would be given a handbook that day. *Id.* at ¶ 90.  Tryon received the handbook. *Id.* at ¶ 91.

On December 14, 2005, Ritter was called to BC Segregation by Deputy Underwood. *Resp.* at ¶ 92.  When Ritter arrived, Tryon was pacing the floor and yelling. *Id.*

Ritter told Tryon to sit down at the table and he would speak to Tryon. *Resp.* at ¶ 93. Once Tryon sat down, Ritter asked him what was wrong. *Resp.* at  ¶ 94.  Tryon replied that Jackson was giving him the run around on her grievance answers about the telephone cards he had purchased. *Id.*

Tryon went to his cell and got his grievances. *Resp.* at ¶ 95.  Tryon told Ritter that he placed some calls on the phone cards and after a minute hung up. *Id.*  When Tryon checked the balance, he stated the call had used the entire card. *Id.*

Tryon stated Jackson had given him a "bullshit" response to his grievances. *Resp.* at ¶ 96.  He told Ritter that the Captain was supposed to handle step C on the grievance not Jackson. *Id.*

Ritter told Tryon that Jackson had the final answer on grievances. *Resp.* at ¶ 97.  Tryon did not like this answer and started to curse. *Id.*  Ritter told Tryon to stop and he complied. *Id.*

According to defendants, Tryon then stated he would "punch out that b----" when he saw her in the hallway and asked if he would get more prison time if he hit Jackson. *Defts' Ex.* at page 107.  Tryon states he merely asked what would happen if someone did this to Jackson. *Resp.* at ¶ 98.

-15-

Tryon stated he would add the claim to the federal lawsuit he had already filed against Jackson. *Resp.* at ¶ 99. Ritter told Tryon not to do anything rash like hit Jackson. *Id.* at ¶ 100. He then placed Tryon back into BC 6. *Id.*

Tryon contends Nurse Reed was deliberately indifferent to his serious medical needs. *Resp.* at ¶ 108. Specifically, he contends she failed to even get x-rays of his elbow. *Id.* He maintains it has bone chips in it and still hurts. *Id.*

With respect to Dyke, Tryon contend Dyke intentionally and maliciously made Tryon uncomfortable during the transport. *Resp.* at ¶ 110. Tryon contends Dyke's actions or omissions "out of spite" caused Tryon to get hurt. *Id.* Tryon maintains Dyke deliberately attempted to conceal Tryon's injury and helped prevent Tryon from getting medical treatment. *Id.*

With respect to Jackson, Tryon's claims are based on her handling of his grievances and on her "extorting" him. *Resp.* at ¶ 109. Further, Tryon maintains Jackson helped to conceal his elbow injury, the fact that he reported it, and helped prevent him from getting medical care. *Id.*

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.  "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## DISCUSSION

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that each defendant acted under color of state law and that he or she violated a right secured by the Constitution.  *West v. Atkins*, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999).   The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.  *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Davidson v. Cannon*, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986).

In this case, Tryon contends his constitutional rights were violated in a number of ways while he was incarcerated at the SCDC or during transport to, or from, the SCDC.  Defendants have moved for summary judgment with respect to all claims.

### *Inadequate Grievance Procedure*

Tryon contends his grievances were not handled properly, he did not always receive responses to his grievances, and he did not always get copies of his grievances.  However, he has not identified a federal constitutional right that he was deprived of because of the alleged

-17-

inadequacies in the SCDC's grievance procedures.  He makes no argument that he was treated differently from other similarly situated prisoners, or that his grievances were ignored because of his exercise of his First Amendment rights, or that his ability to exercise any specific constitutional right was chilled by defendants' actions.

"Inmates do not have a constitutionally protected right to a grievance procedure.  Because a state grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the state's grievance procedure is not actionable under § 1983." *Ashann-Ra v. Commonwealth of Virginia*, 112 F. Supp. 2d 559, 569 (W.D. Va. 2000)(citations omitted).  *See also Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)(inmates have no constitutional right to grievance procedure); *Blagman v. White*, 112 F. Supp. 2d 534 (E.D. Va. 2000)(inmate has no constitutional entitlement to grievance procedure), *aff'd*, 3 Fed. Appx. 23 (4th Cir. 2001).

"Rather, prison inmates have a constitutional right to petition the government for redress through a right of access to the courts." *Blagman*, 112 F. Supp. 2d at 542 (*citing Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)).  A jail's "refusal to entertain such grievances does not compromise the inmate's constitutional rights, as access to the courts would still be available." *Blagman*, 112 F. Supp. 2d at 542 (*citing, Scott v. Kelly*, 107 F. Supp. 2d 706 (E.D. Va. 2000), *aff'd*, 6 Fed. Appx. 187 (4th Cir. 2001)).  "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel v. Goord*, No. 00 CIV. 2042, 2001 WL 303713, *3 (S.D.N.Y. March 29, 2001).

Tryon submitted multiple grievances.  *See Defts' Ex.* 1.  Although he was not always satisfied with the defendants' response, Tryon received responses to the majority of the grievances and in several cases appealed the grievance response because he was dissatisfied.  *Id.*

-18-

The lack of a meaningful grievance procedure did not deprive Tryon of access to the courts. Accordingly, this claim fails.

### Access to the Courts

Tryon contends some of his legal papers were lost by SCDC deputies, attorney Kevin Hickey was not allowed to see Tryon on one occasion, and he did not have the address for the higher courts. *See Resp.* at ¶ 37, ¶ 59(A), ¶ 59(J). "Inmates undeniably enjoy a constitutional right of access to the courts and the legal system." *Myers v. Hundley*, 101 F.3d 542, 544 (8th Cir. 1996)(*citing, Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 2179, 135 L. Ed. 2d 606 (1996); *Bounds v. Smith*, 430 U.S. 817, 821, 97 S. Ct. 1491, 1494-95, 52 L. Ed. 2d 72 (1977)).   In *Myers,* the Eighth Circuit stated that:

> [t]o protect that right, prisons must provide inmates with some access to legal materials or to legal assistance so that inmates can prepare and pursue complaints, and with some ability to mail these complaints and related legal correspondence once prepared. Inmates do not have a right, however, either to law libraries or to unlimited stamp allowances for legal mail.  Instead, the duty to make such arrangements is bounded by the inmates' right of meaningful access to the courts.  To state a claim that a law library or legal assistance program violates this right, inmates must assert that they suffered an actual injury to pending or contemplated legal claims.  Alleging theoretical inadequacies is insufficient. Inmates must instead show, for example, that a complaint that they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a complaint for actionable harm at all.

*Myers*, 101 F.3d at 544 (citations omitted).

 In *Cody v. Weber*, 256 F. 3d 764 (8th Cir. 2001), the Eighth Circuit noted that the Supreme Court in *Lewis v. Casey*, 518 U.S. 343, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996) and *Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977), "determined that the right of access to the courts guarantees an inmate the ability to file lawsuits that directly or collaterally

-19-

attack the inmate's sentence or that challenge the conditions of the inmate's confinement, but it does not extend to the right to 'discover grievances' or to 'litigate effectively once in court.'" *Cody*, 256 F. 3d at 767-68 (*quoting Lewis*, 518 U.S. at 354-55).

In this case, Tryon's claim fails because he has suffered no actual injury. While he states some of his legal papers were lost during a cell search, an attorney who his wife wanted to represent him was not allowed to see him on one occasion, he was not given a pen or pencil, and he missed a deadline for failing a writ, Tryon had access to a phone, was able to send and receive mail to, and from, the courts, he could file motions with the courts, his attorney could visit him at the SCDC, call him there, or write him, and he was able to file this civil rights action while he was incarcerated at the SCDC. *Resp.* at ¶ 59(C), ¶ 59(D), ¶ 59(G), ¶ 59(H); *Complaint* (Doc. 1). *See Klinger v. Department of Corrections*, 107 F.3d 609, 617 (8th Cir. 1997) (to prevail on access-to-courts claim, inmate must show actual injury or prejudice even if denial of access to library is complete and systematic). Further, he was able to submit numerous grievances, he had his legal papers in his cell, and even if he did not have access to a pen or pencil on a daily basis he certainly had access on a frequent basis as is obvious from the number of grievances he submitted to defendants.

Although "[p]ro se defendants have a right of access to adequate law libraries or adequate assistance from persons trained in the law," *United States v. Knox*, 950 F.2d 516, 519 (8th Cir. 1991)(quotations omitted), the right is not an abstract one and the inmate must "demonstrate that the alleged shortcomings . . . hindered his efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351. Tryon's allegations are insufficient as a matter of law.

### Denial of Medical Care

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 1719, 140 L. Ed. 2d 1043 (1998)(citation omitted). Inadequate medical care claims brought by convicted prisoners are analyzed under the Eighth Amendment's deliberate indifference standard. *See e.g., Hartsfield v. Colburn*, 371 F.3d 454, 456-457 (8th Cir. 2004). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by

-21-

medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

Tryon contends Nurse Reed exhibited deliberate indifference because she would not help him or order an x-ray for his elbow. *Resp.* at ¶ 108. He contends he has bone chips and his elbow still hurts. *Id.*

According to Nurse Reed's records she saw Tryon on November 15, 2004. *Defts' Ex.* 1 at page 12-13. He was complaining of a broken finger. She examined his finger. *Id.* She offered to "buddy tape" his finger to the ring finger. *Id.* Tryon refused her suggestion stating he would guard the finger. *Id.* Tryon requested x-rays but Nurse Reed advised him the hospital would only "buddy tape" the fingers. *Id.*

After Tryon indicated he had fallen out of the van the week before and hit his elbow and stated he thought it was chipped, she also examined his elbow. *Id.* at page 13. *See also Resp.* at ¶ 18. Nurse Reed noted a small bump on the right elbow that could be moved around. *Defts' Ex.* 1 at page 13. She noted it felt like a soft pea mass. She also noted Tryon did not complain of any pain in his elbow and did not ask for any pain medication. *Id.*

Tryon did not submit any further requests for medical treatment for his elbow. *Resp.* at ¶ 19(A). Although he filed numerous grievances on other subjects, Tryon did not mention his elbow again until nearly ten months later on September 8, 2005, when he complained that his elbow had been shattered when he fell out of a van during transport in October of 2004. *Defts' Ex.* 1 at page 63; *Resp.* at ¶ 43; *Resp.* at ¶ 46 (I had reported the injury to Nurse Reed (see page 17 (a reference to the November 15, 2004, visit to Nurse Reed)).

-22-

There is no genuine issue of material fact as to whether Nurse Reed exhibited deliberate indifference to Tryon's serious medical need. Instead, Tryon merely disagree's with Nurse Reed's evaluation of his elbow injury. A mere disagreement with a medical evaluation does not establish deliberate indifference. *Alberson v. Norris*, 458 F.3d 762 (8th Cir. 2006)(Prisoner's disagreement with treatment decisions does not establish deliberate indifference).

With respect to Jackson and Dyke, there is no indication they made any decisions regarding any necessary medical care. *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)(no evidence the defendants were medical personnel or were personally involved in making medical decisions about the plaintiff's treatment). Instead, at least with respect to Jackson, when she learned of Tryon's claim that his elbow had been injured when he fell from the van, she merely informed Tryon to submit a request for medical care if he needed medical attention. *Defts' Ex.* 1 at page 63; *Resp.* at ¶ 45.

With respect to Dyke, Tryon has alleged Dyke refused to provide Tryon with medical care. However, Dyke was being transported to the ADC when he was allegedly injured. Tryon has indicated the injury occurred at the Lee County Jail which is in Marianna, Arkansas. Tryon was being transported to Brickeys, Arkansas, where the ADC, East Arkansas Regional Unit, is located. Brickeys is also in Lee County and Brickeys is less than twenty miles from Marianna.[2] Tryon indicates he received help when he arrived at the ADC and he was seen by a nurse at the ADC. At most, Dyke delayed Tryon's receipt of medical care by an hour or two.

> "When the inmate alleges that a delay in medical treatment rises to the level of
> an Eighth Amendment violation, the objective seriousness of the deprivation

---

[2]A court may take judicial notice of the distance between two places. *See e.g., Mutual Benefit Life Insurance Co. v. Robison*, 58 F. 723 (8th Cir. 1893).

AO72A
(Rev. 8/82)

should also be measured by reference to the *effect* of the delay in treatment.  To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment."

*Lauglin v. Schriro*, 430 F.3d 927 (8th Cir. 2005)(internal citations and quotation marks omitted).

In this case, there is nothing in the record before the court to suggest that this short delay caused any detrimental effect on Tryon's medical condition.  Once at the ADC, Tryon was seen by medical personnel and prescribed Tylenol.  There is no indication that any other medical care was believed necessary.  Although Tryon refers to his elbow as being "shattered" and containing "bone chips," nothing in the records from the ADC or the SCDC support this assertion.  Additionally, there is no indication in the ADC records or the SCDC records that Tryon made any further requests for medical treatment to his elbow until Tryon submitted his grievance in September of 2005.

Nor do we believe there is a genuine issue of material fact as to whether defendants attempted to conceal Tryon's injury.  First, Tryon immediately advised ADC personnel of his injury.  Second, Tryon was well versed in the use of the grievance system at the SCDC and knew how to obtain medical care.  Despite this, there is no indication he mentioned his elbow injury or the fall from the van between November 15, 2004, and September 8, 2005.

### Deductions from Inmate Account

Tryon also contends his rights were violated by various deductions from his inmate account for transportation to doctor's appointments and for medical treatment at the jail.  He also contends it was error for the defendants to freeze his account or deduct the funds when he submitted a grievance about his elbow being injured even though he had not yet seen the nurse.

While the Eighth Amendment's prohibition against cruel and unusual punishment

-24-

AO72A
(Rev. 8/82)

requires jails to provide basic medical care to inmates, there is no requirement that the jails provide the medical care free of cost. *See e.g., Reynolds v. Wagner*, 128 F.3d 166, 173-74 (3rd Cir. 1997)(deliberate-indifference standard does not guarantee prisoners right to be entirely free from cost considerations that figure in medical-care decisions made by most non-prisoners in society). Inmates may be constitutionally required to pay for their own medical expenses, if they can afford to do so. *Roberson v. Bradshaw*, 198 F.3d 645 (8th Cir. 1999). *See also Jensen v. Klecker*, 648 F.2d 1179, 1183 (8th Cir. 1981)(no basis for due process claim where deductions from prisoner accounts were assessments for value received).

Tryon has not alleged that he was unable to obtain necessary medical care because of the requirement that he bear the cost, or some portion of the cost, of the care. Tryon does not contend the deductions resulted in his not being able to obtain necessary items such as hygiene items. Tryon's claim is based solely on the fact that the detention center collected funds for medical services that had been, or would be, rendered during his incarceration either in connection with medical care or after he submitted a grievance about his elbow being injured. Given that Tryon asserted his elbow was shattered and he wanted it fixed, *Resp.* at ¶ 43, in his September 8, 2005, grievance, it was certainly reasonable to assume he would be requesting medical care. Although Tryon's funds were frozen, or taken *see Resp.* at ¶ 48, following this request, after Tryon objected to this action, the funds were released back to him on September 28, 2005. *Resp.* at ¶ 57 & ¶ 58.

With respect to the deduction for transportation costs, we note that detention facilities, so long as detainees are not deprived of basic necessities, may attempt to defray some jail costs. *See e.g., Salde v. Hampton Roads Regional Jail*, 407 F.3d 243 (4th Cir. 2005)(One dollar per day

-25-

assessment to held defray jail costs did not state a takings claim and did not constitute punishment under the Constitution); *Elliott v. Simmons*, 100 Fed. Appx. 777 (10th Cir. 2004)(Scheme for assessing inmate fees did not violate inmate's equal protection rights as the goals behind the fee structure were to teach fiscal responsibility and to reimburse the state for costs of incarceration); *Owens v. Sebelius*, 357 F. Supp. 2d 1281 (D. Kan. 2005)(imposition of $25 a month supervision fee is not an unlawful bill of attainder, does not violate the *ex post facto* clause or the Fifth, Eighth and Fourteenth Amendments of the Constitution); *Anderson v. Kline*, 2005 WL 327148 (D. Kan. 2005)("the collection of various fees and payments advances a policy of offender accountability and rehabilitation, and reimburses the State of Kansas for services provided.").

Finally, even if the deductions could be said to be improper, no claim of constitutional dimension is stated. While an inmate does have a protected property interest in the funds in his prison account, not every deduction made violates the Due Process Clause of the United States Constitution. See *Mahers v. Halford,* 76 F.3d 951, 954 (8th Cir. 1996); *Jensen v. Klecker*, 648 F.2d 1179, 1183 (8th Cir. 1981) (holding that inmates have a property interest in their money); *Sell v. Parratt*, 548 F.2d 753, 757 (8th Cir. 1977) (same); *Robinson v. Fauver* , 932 F. Supp. 639, 645 (D.N.J. 1996); *Johnson v. Dept. of Public Safety and Correctional Services*, 885 F. Supp. 817, 821 (D. Md. 1995)(due process is not violated when deductions are made from an inmate's account "quite simply because they have purchased something on their own initiative."); *Scott v. Angelone*, 771 F. Supp. 1064, 1067-68 (D. Nev. 1991) (inmate not denied due process of law when account charged for medical visits where inmate had prior notice of policy). Tryon was able to challenge the deductions through the grievance procedure. Although he was not always

satisfied with the outcome, on at least one occasion, he was able to get his funds released after having submitted a grievance.

The United States Supreme Court has held that neither the negligent nor intentional random or unauthorized deprivations of property under color of state law are actionable where a plaintiff has an adequate state post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 533, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984); *Parratt v. Taylor*, 451 U.S. 527, 541, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981), *overruled in part on other grounds*, *Daniels v. Williams*, 474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986); *Barnett v. Centoni*, 31 F.3d 813 (9th Cir. 1994)(negligent or intentional deprivation of prisoner's property fails to state claim under § 1983 if state has adequate post-deprivation remedy). Arkansas law recognizes a cause of action for conversion when property is wrongfully taken from its owner. *Elliot v. Hurst*, 307 Ark. 134, 817 S.W.2d 877, 880 (1991)(cause of action for conversion lies where distinct act of dominion is exerted over property in denial of owner's right). The deductions from Tryon's inmate account simply do not rise to a claim of constitutional dimension.

### *Conditions During Transportation*

On some unspecified date during 2004 while Tryon was being transported by Dyke, Tryon maintains Dyke refused to allow Tryon to use the restroom for between five and seven hours. *Initial Response* (Doc. 23) at ¶ 1. Although he asked to use a restroom, Tryon states he was told by Dyke that he would have to "hold it or go in his pants." *Id. & Complaint* at page 4. According to Tryon, he has alleged in his complaint that he used the bathroom in his pants. *Id.* Tryon maintains Dyke's actions violate the Eighth Amendment.

-27-

This claim is subject to dismissal because the plaintiff did not exhaust his administrative remedies with respect to the claim.  As amended by the PLRA,  42 U.S.C. § 1997e(a) mandates exhaustion of available administrative remedies before an inmate files suit.  Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

The Supreme Court in *Booth v. Churner*, 532 U.S. 731, 738-39, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001) held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." *Walker v. Maschner*, 270 F.3d 573, 577 (8th Cir. 2001).  Further, the term "administrative remedies" has been held to encompass remedies not promulgated by an administrative agency. *Concepcion v. Morton*, 306 F.3d 1347, 1352 (3d Cir. 2002).  Specifically, it has been held that a grievance procedure contained in a handbook constitutes an available administrative remedy within the meaning of § 1997e(a).  *Conception*, 306 F.3d at 1352.  When all claims have not been exhausted, the case is subject to dismissal.  *Jones v. Norris*, 310 F.3d 610, 612 (8th Cir. 2002); *Graves v. Norris*, 218 F.3d 884, 885 (8th Cir. 2000).

Clearly exhaustion is a prerequisite to asserting a claim.  *Porter v. Nussle*, 534 U.S. 516, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002).  While dismissal of the case is proper when at least some of the claims are unexhausted, *Graves v. Norris*, 218 F.3d 884, 885-86 (8th Cir. 2000), we believe it is proper, under the circumstances, to dismiss this single claim for failure to exhaust. As the Eighth Circuit has noted, a plaintiff should be given leave to amend his complaint to cure the defect necessitating dismissal. *Kozohorsky v. Harmon*, 332 F.3d 1141, 1144 (8th Cir. 2003).

-28-

The plaintiff is an incarcerated individual who is proceeding pro se.  We will therefore construe the complaint to contain only exhausted claims.  *See Thornton v.  Phillips County, Ark.*, 240 F.3d 728, 729 (8th Cir. 2001).

## CONCLUSION

I therefore recommend that the defendants' motion for summary judgment be granted and this action be dismissed.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 18th day of December 2006.

/s/ Beverly Stites Jones
UNITED STATES MAGISTRATE JUDGE

-29-

AO72A
(Rev. 8/82)